# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| AMANDA R. WERTS, | : | Case No. 3:16-cv-316 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.      Introduction

Plaintiff Amanda R. Werts brings this case challenging the Social Security Administration's denial of her applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income.  She applied for benefits on January 13, 2012, asserting that she could no longer work a substantial paid job.  Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), and the administrative record (Doc. #6).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II.    Background

Plaintiff asserts that she has been under a "disability" since January 1, 2010. She was thirty-two years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a limited education. *See id.* §§ 404.1564(b)(3), 416.964(b)(3).

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Motta that fatigue and pain in her back and neck bother her the most. (Doc. #6, *PageID* #91). Plaintiff was told that her fatigue is due to fibromyalgia, and she also has a very difficult time going to sleep and staying asleep. *Id.* She usually only sleeps five hours per night, and once a week, she does not sleep at all. *Id.* at 103.

Plaintiff has a problem with loss of bladder control that occurs on daily. *Id.* at 102. She does not know the cause, but she was told she has a pinched nerve in her back. *Id.* She did not think physical therapy was helpful. *Id.* The only medication she takes for pain is hydrocodone, and she tries not to because of the side effects. *Id.* at 91. A doctor prescribed a tens unit, and she uses it once a week for approximately thirty minutes at a time. *Id.* at 103. It helps her pain temporarily. *Id.*

She experiences numbness and tingling in her hands, fingers, toes, and sometimes shins. *Id.* at 104. A neurologist indicated that it could be carpal tunnel but could not

confirm the diagnosis without an EMG of Plaintiff's legs.  *Id*.  She started but could not

finish the EMG because it was too painful on her legs.  *Id*.  A pain specialist, Dr. Soin,

wanted her to complete a functional capacity evaluation.  *Id.*  However, her insurance

only covered part of the cost and she could not afford to pay for it.  *Id.* at 105.

Plaintiff has also had migraine headaches for the past three years.  *Id.* at 91.  Her

symptoms include pain and nausea.  *Id.* at 104.  She sometimes takes over-the-counter

medicine but it is not very helpful and she usually has to "wait it out."  *Id.* at 92.

She has bursitis in her hips that causes pain.  *Id.* at 99.  If she has to drive for more

than twenty minutes, she must stop and walk around for a few minutes because of the

pain.  *Id.*  She is also not able to sleep on her side.  *Id*.

Plaintiff's cardiologist diagnosed "left diastolic dysfunction" and prescribed

medication.  *Id.* at 106.  Her symptoms include chest pain and shortness of breath.  *Id.*

She still experiences these symptoms because she forgets to take her medication until

they start.  *Id.*

Plaintiff also has anxiety and depression.  *Id.* at 92.  She tried several different

medications but "they don't work out for me.  Because of the side effects and also I have

a hard time remembering to take my medication."  *Id*.  At the time of the hearing, she

attended counseling at Darke County Mental Health approximately once per month.  *Id.*

at 104-05.  Her primary-care physician, Dr. Hunter, prescribed medication in the past.  *Id.*

at 93.

She has had approximately three panic attacks in her life.  *Id.* at 100.

Additionally, she was diagnosed with ADHD (attention-deficit hyperactivity disorder).

*Id.* at 105.  She has trouble focusing and understanding what people say to her and what she reads.  *Id.* at 106.  She also has some OCD (obsessive-compulsive disorder) behaviors.  *Id.* at 100-01.  For example, she repeatedly checks things like doors, windows, and the stove.  *Id.* at 101.  She has a fear of heights, deep water, spiders, earwigs, and something bad happening to her or her children.  *Id*.  She gets nervous when she has to go to a public place.  *Id*.

Plaintiff lives in an apartment with her boyfriend, six-year-old son, and sixteen-year-old daughter.  *Id.* at 88.  She has a driver's license and drives approximately eight times a week.  *Id*.  Her son is homeschooled and she has to monitor him daily.  *Id.* at 93. She struggles with preparing meals, and when she does, she only makes simple things. *Id.* at 94.  She has difficulty washing dishes as well.  *Id*.  She can only stand for ten minutes at the sink before she has to lie down.  *Id*.  She is "not very good at keeping up on [laundry]…."  *Id.* at 95.  Her boyfriend does most of the grocery shopping, and she only goes twice per month.  *Id*.  She sees her family once every two months and does not usually see any friends.  *Id*.  She is able to dress herself, bathe/shower, use a computer, and sell things online.  *Id.* at 96.  She estimated that she can lift five pounds, stand for ten minutes, walk for one block, and sit for ten minutes.  *Id.* at 98-99.

Plaintiff worked at Wendy's part-time until December 2013, when she quit.  *Id.* at 90.  She was a cashier but also occasionally cleaned the dining room, worked in the drive through, washed dishes, and made sandwiches.  *Id*.  She testified that she called off work at least three times per month, went to work late, and asked others to cover her shifts.  *Id.* at 90-91.  She quit because she was in severe pain.  *Id*. at 90.

### B. Medical Opinions

#### i. Robert Hunter, D.O.

Dr. Hunter, Plaintiff's primary-care physician, completed two questionnaires. *Id.* at 1238-40, 1546-47. On the first, he indicated that Plaintiff suffers from chronic pain that is between moderate and severe. *Id.* at 1546. He opined she had a marked restriction of activities of daily living; marked difficulty in maintaining social functioning; and marked deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner. *Id.* Further, she has no work capacity, and her impairments and/or treatment would cause her to be absent more than three times per month. *Id.* at 1547.

Dr. Hunter, in response to the second questionnaire, opined Plaintiff has fatigue, non-restorative sleep, insomnia, cognitive/memory problems, anxiety, depression, nervousness, heartburn, headache, muscle pain, numbness/tingling, chest pain, hearing difficulties, and hair loss. *Id.* at 1238. He also indicated that she has fifteen out of eighteen tender points. *Id.* at 1239. Dr. Hunter concluded Plaintiff could not work for any amount of time. *Id.* at 1240. However, she can stand for fifteen minutes at one time but not at all in a workday; sit for thirty minutes at one time but not in a workday; lift ten pounds occasionally; bend occasionally; never stoop; and frequently raise her arms over shoulder level. *Id.*

#### ii. Irfan A. Dahar, M.D., & Teri Stephenson, PCC-S

Ms. Stephenson completed a mental impairment questionnaire on March 17, 2014, and Dr. Dahar signed it on May 28, 2014. *Id.* at 1237. They diagnosed Plaintiff with

generalized anxiety disorder, obsessive-compulsive disorder, depressive disorder not otherwise specified, and attention-deficit hyperactivity disorder. *Id.* at 1234. They identified several of Plaintiff's signs and symptoms, including, poor memory, sleep disturbance, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking and concentrating, perceptual disturbances, decreased energy, obsessive or compulsions, persistent irrational fears that get out of hand, generalized persistent anxiety, and hostility/irritability. *Id.*

They opined that Plaintiff's prognosis is fair but noted, "Pain interferes with day to day functioning, which then exacerbates depression and anxiety." *Id.* at 1235. On average, she would miss more than three days of work per month due to her impairments and treatment. *Id.* at 1236. She has marked restrictions of activities of daily living and marked difficulty in maintaining social functioning. *Id.* She is markedly limited in her ability to understand, remember, and carry out detailed instructions; she is extremely limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

### iii. Jerry E. Flexman, Ph.D.

Dr. Flexman evaluated Plaintiff on January 8, 2014. *Id.* at 1270. He noted that Plaintiff worked at Wendy's for nine years and was currently working six to seven hours per week. *Id.* Dr. Flexman indicated that she presented to the evaluation "clean but slightly disheveled." *Id.* at 1271. Her "[f]acial expressions revealed some apprehension

and general body movements were generally fidgety." *Id.* Her affect was slightly

anxious. *Id.*

Dr. Flexman administered several tests:

> On the Structured Inventory of Malingered Symptoms we note her score was above the cut off score, showing elevations on the neurological impairment and affective distress scales. This would suggest an individual who tends to overreact in these areas.
>
> .   .   .
>
> The Projective Drawing Test reveals some depression, anger, anxiety and histrionic characteristics.
>
> .   .   .
>
> On the Millon Clinical Multiaxial Inventory the results indicate significant personality features, such as avoidant personality and dependent features, with passive aggressive behaviors as well.
>
> The Minnesota Multiphasic Personality Inventory was administered and the profile was considered valid. Tendencies to exaggerate and over-respond to problems were indicated. Marked anxiety and depression are indicated, as well as a great deal of anger. These individuals have difficulty expressing their negative emotions in an appropriate manner, and often internalize them. Impulse control, with some substance abuse problems is often seen. They tend to be rather cynical and demanding. Hysteroid traits are often seen as well. They tend to ruminate over problems and worry a great deal. Physical complaints are often seen as a result of unresolved psychological and emotional issues. Secondary gain issues cannot be ruled out.

*Id.* at 1272.

Dr. Flexman opined that Plaintiff "does appear to demonstrate symptoms

consistent with a mild Mixed Expressive Receptive Language Processing Disorder. This

would certainly interfere with her ability to sustain attention to task, as well as to interact

with others in an efficient and effective manner." *Id.* at 1273. However, the results were

not consistent with an organically induced attention-deficit hyperactive disorder. *Id.* He diagnosed depression and anxiety, and indicated that they were "probably the result of family of origin issues." *Id.*

Further, Dr. Flexman opined, "Clearly, psychotherapeutic intervention is strongly warranted … [and] she would benefit from medication such as Wellbutrin, to help with the depression and anxiety, as well as some of the attention problems she experiences." *Id.* However, he warned, "Medication without psychotherapy is probably going to be minimally effective in resolving many of the issues she experiences." *Id.* He concluded, "It is unfortunate that she has been advised to work only a minimal amount of hours, as I believe this would benefit her in her own self-esteem and her ability to increase her confidence in her ability to perform tasks. Appropriate medication may make it easier to do this." *Id.*

### iv. Alan R. Boerger, Ph.D.

Dr. Boerger evaluated Plaintiff on December 12, 2012. *Id.* at 814. She reported that she was applying for disability benefits because of her pain. *Id.* He noted that her life has been marked by several significant events: Her father, a Vietnam veteran, committed suicide when she was a baby; her mother was abused by Plaintiff's step-father; she dropped out of high school in eleventh grade; and her (now) ex-husband was physically abusive. *Id.* at 815-17. Dr. Boerger diagnosed depressive disorder not otherwise specified and generalized anxiety disorder. *Id.* at 818. He opined that Plaintiff's "depression and anxiety appear to be reactive to multiple physical problems

and past abuse. Because of ongoing stressors, emotional symptoms are likely to continue for the indefinite future." *Id.* at 818-19.

Dr. Boerger noted that Plaintiff's "depression and anxiety may limit her ability to tolerate work pressures in a work setting." *Id.* at 820. He indicated that she related in an appropriate manner with him and there was no indication of difficulty relating to others in a work situation. *Id.* However, "Because of the history of abuse she may have some difficulty in dealing with aggressive males." *Id.*

### v. Paul Tangeman, Ph.D., & Katherine Fernandez, Psy.D.

Dr. Tangeman reviewed Plaintiff's records on January 2, 2013. *Id.* at 121-33. He found that Plaintiff has three severe impairments: fibromyalgia, a spine disorder, and an affective disorder. *Id.* at 126-27. She has moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. *Id.* at 127. Dr. Tangeman opined Plaintiff "should be able to perform simple to moderately complex tasks (1-4 step[s]) that [are] repetitive." *Id.* at 130. Due to her history of abuse, she "may have difficulties interacting with aggressive males …. She would work best independently or with the public on a superficial basis." *Id.* at 131. Her work should be static. *Id.*

On April 2, 2014, Dr. Fernandez reviewed Plaintiff's records and agreed with Dr. Tangeman's findings. *Id.* at 151-65.

### vi.  Abraham Mikalov, M.D., & Venkatachala Sreenivas, M.D.

On October 19, 2012, Dr. Mikalov reviewed Plaintiff's records.  *Id.* at 121-33.  He opined Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently.  *Id.* at 128-29.  She could stand and/or walk for six hours total in an eight-hour workday and sit for six hours total.  *Id.* at 129.  She can occasionally climb ladders, ropes, and scaffolds.  *Id.*  Dr. Mikalov concluded Plaintiff was not under a disability.  *Id.* at 133.

Dr. Sreenivas reviewed Plaintiff's records on April 15, 2013.  *Id.* at 151-56.  Dr. Sreenivas agreed with a majority of Dr. Mikalov's assessment, including his conclusion that Plaintiff was not under a disability.  *Id.*  However, there were a few differences:  Dr. Sreenivas opined Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently.  *Id.* at 160.  Additionally, she could occasionally crawl and frequently climb ramps and stairs.  *Id.*

## III.  <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.     The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to

Plaintiff's application for benefits.  She did so by considering each of the five sequential

steps set forth in the Social Security Regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

She reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since
            January 1, 2010.

Step 2:     She has the severe impairments of: symptoms attributed to
            fibromyalgia, mild obesity, mild cervical spine radiculopathy, mild
            lumbar spine radiculopathy, depressive disorder, and anxiety disorder
            with features of obsessive-compulsive disorder.

Step 3:     She does not have an impairment or combination of impairments that
            meets or equals the severity of one in the Commissioner's Listing of
            Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity, or the most she could do despite her
            impairments, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239
            (6th Cir. 2002), consists of "'light work' … including lifting up to 20
            pounds occasionally and 10 pounds frequently, subject to some
            additional limitations:  [Plaintiff] can perform postural activities (i.e.,
            climbing ramps or stairs, balancing, stooping, kneeling, crawling,
            crouching, twisting side to side) no more than occasionally.  She can
            operate foot controls bilaterally no more than occasionally.  [Plaintiff]
            cannot climb ladders, ropes or scaffolds.  She should not be exposed
            to hazards such as dangerous machinery or unprotected heights.
            [Plaintiff] should avoid concentrated exposure to dust, odors, fumes,
            gases, chemicals or poorly ventilated areas.  She should not be
            exposed to temperature (both hot and cold) extremes or extreme

---

[2] The remaining citations to the Regulations will identify the pertinent Disability Insurance Benefits
Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

humidity or wetness.  [Plaintiff] is limited to performing simple repetitive tasks.  She is limited to low-stress work (i.e., no strict production quotas or fast pace and only routine work with few changes in work setting).  She should have no more than occasional contact with the public, co-workers and supervisors."

Step 4:      She is unable to perform any of her past relevant work.

Step 5:      She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 42-67).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 67.

## V.     <u>Discussion</u>

Plaintiff contends that the ALJ erred in weighing the medical opinions.  She also argues that the ALJ erred in her analysis of Plaintiff's credibility.  The Commissioner maintains that substantial evidence supports both the ALJ's evaluation of the medical opinions and her evaluation of Plaintiff's subjective complaints.

### A.     **Treating Doctors**

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

### i. Dr. Hunter

ALJ Motta gave Dr. Hunter's opinions regarding Plaintiff's mental limitations "no weight" and his opinions on her physical condition and capabilities "little-to-no weight." (Doc. #6, *PageID* #s 53, 59). The two questionnaires he completed addressed Plaintiff's fibromyalgia and chronic pain syndrome. Accordingly, his opinions are related to those conditions and include the effect of Plaintiff's pain and other symptoms on both her physical and mental capabilities. For example, Dr. Hunter indicated Plaintiff has marked restriction of activities of daily living and explained that it is "[p]ainful to do any

activities ….” *Id.* at 1546-47.  Although ALJ Motta distinguished between mental and physical limitations, due to the close relationship between Plaintiff's mental and physical limitations and because ALJ Motta gave similar reasons for rejecting Dr. Hunter's opinions on all limitations, the Court will address them together.

The first condition of the treating physician rule requires the opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques.  ALJ Motta found Dr. Hunter's opinions concerning Plaintiff's mental functioning capabilities are not well supported and his opinions concerning her physical capabilities “are entirely unsupported….” *Id.* at 52, 60.  She concluded that the limitations proposed by Dr. Hunter must be based solely on Plaintiff's subjective complaints.  *Id.* at 52 (“The extent of impairment described by Dr. Hunter could only be based on uncritical acceptance of [Plaintiff] subjective complaints ….”; *id.* at 59 (Dr. Hunter's purported extensive functional limitations are based on nothing more definitive than [Plaintiff's] subjective chronic pain complaints.”).

ALJ Motta fails to acknowledge that substantial evidence in the record supports Dr. Hunter's opinion.  Importantly, “For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be fully supported by such evidence.”  Soc. Sec. R. 96-2p, 1996 WL 374188, at *2.  Treatment notes from Dr. Hunter's office, Buckeye Family Practice, support his opinion.  On April 11, 2014, Victoria Brookshire, N.P., observed Plaintiff “moving very stiffly.”  (Doc. #6, *PageID* #15120.  She further noted, “Back pain to palpation (low back mid scapular [muscles] especially left side, some spasm noted with movement, firm to

palpation), decrease ROM (flexion 30 degrees with complaint of pain, lateral flexion 20 degrees with pain to right slightly more to left with less pain) ….” *Id.* at 1512. Similarly, Vestine Kiza, P.A., discovered on April 18, 2014, that Plaintiff had abnormal muscle strength, limited range of motion, and back pain to palpation. *Id.* at 1507-08. Additionally, she was depressed and anxious. *Id.* On May 30, 2014, Dr. Hunter found Plaintiff had tenderness, limited range of motion, and fifteen of eighteen points. *Id.* at 1503.

Other medical providers’ notes and evaluations support Dr. Hunter’s opinion. Plaintiff’s former counselor Ms. White recognized in November 2012 that Plaintiff had “poor relationships” and “few friends.” *Id.* at 812. When asked to describe what might prevent work activities for usual workday or workweek, she responded, “Poor attendance. Poor stress tolerance, fatigue, physical discomfort. Depressed mood.” *Id.* Dr. Flexman reported that a mild Mixed Expressive Receptive Language Processing Disorder “would certainly interfere with her ability to sustain attention to task, as well as to interact with others in an efficient and effective manner.” *Id.* at 1273. And, as mentioned by ALJ Motta, “Dr. Ranginwala identified ‘multiple tender points’ indicative of fibromyalgia.” *Id.* at 47. Further, Dr. Schriber suggested Plaintiff could have fibromyalgia. *Id.*

Further, ALJ Motta committed error to the extent she required objective evidence of fibromyalgia. Case law establishes, and Soc. Sec. R. 12-2p indicates, that a patient suffering from fibromyalgia presents to physicians with no objective signs or symptoms. Indeed, “fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively

alarming signs." *Rogers*, 486 F.3d at 243 (footnote omitted) (citing, in part, *Preston v. Sec'y of HHS*, 854 F.2d 815, 820 (6th Cir. 1988)); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (the ALJ mistakenly "depreciated the gravity of Sarchet's fibromyalgia because of the lack of any evidence of objectively discernible symptoms, such as a swelling of the joints."); *Starcher v. Comm'r of Soc. Sec.*, No. 2:15cv3113, 2016 WL 5929048, at *5 (S.D. Ohio, 2016) (Kemp, M.J.) report and recommendation adopted, 2016 WL 6493427 (Nov. 2, 2016) (Graham, D.J.).

Additionally, it is not reasonable for ALJ Motta to assume that Dr. Hunter relied solely on Plaintiff's subjective complaints because he did not indicate in any way that he relied only on Plaintiff's subjective reports and because physicians are trained to both consider and investigate subjective reports as opposed to blindly accepting them on face value. *See Felisky v. Bowen,* 35 F.3d 1027, 1040 (6th Cir. 1994) ("According to the Secretary, a physician's job is not to question his or her patient's statements, but is rather to match those statements with a diagnosis.").

ALJ Motta also addresses the second condition of the treating physician rule— whether the opinion is not inconsistent with the other substantial evidence in the case record. She found that his opinion concerning Plaintiff's mental limitations is not consistent with other substantial evidence. A treating physician's opinion, however, need not be consistent with other substantial evidence—it need only be "not inconsistent" with other substantial evidence of record. The difference is significant. The Social Security Administration defines "not inconsistent:" "This is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the

other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." Soc. Sec. R. 96-2p, 1996 WL 374188, at *3. By needing Dr. Hunter's opinions be consistent with the record, the ALJ required more of him than the Regulations require. This constitutes error. *See Bowen*, 478 F.3d at 746 ("[A] decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." (citing *Wilson,* 378 F.3d at 546-47)).

However, even if Dr. Hunter's opinion is not entitled to controlling weight under the treating physician rule, ALJ Motta's review is not complete. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927." Soc. Sec. R. 96-2p, 1996 WL 374188, at *4.

ALJ Motta did address the specialization factor, noting, "Treating family physician Dr. Hunter is not a recognized mental health professional (i.e., psychiatrist or licensed psychologist)." (Doc. #6, *PageID* #52). However, she began her analysis of Dr. Hunter's opinion with it, and this constitutes error: "these factors are properly applied only *after* the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)) (emphasis added).

ALJ Motta also acknowledged that Dr. Hunter was Plaintiff's treating physician. However, she did not discuss the length of treatment, frequency of exam, nature of

treatment, or extent of treatment relationship. *See* 20 C.F.R. § 404.1527(c)(1)-(2). This was a pronounced omission because the Sixth Circuit "has made clear that '[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009).

### ii. Dr. Dahar/Ms. Stephenson

ALJ Motta assigned Ms. Stephenson's opinion "no weight." (Doc. #6, *PageID* #54). She correctly observed that as a treating therapist, Ms. Stephenson is not an "acceptable source" under the Regulations and, instead, falls under the category of "other sources." *See* 20 C.F.R. § 404.1513(a), (d). Evidence from "other sources" can only be used to show the severity of impairments and how a claimant's impairments affect her ability to work. *Id.* § 404.1513(d).

ALJ Motta then found,

> [I]nformation provided by therapists does not equal in probative value reports from those medical sources shown as being acceptable such as licensed psychologist. The findings of evaluating and examining psychologists document, at most, moderate (rather than marked) limitation of mental functioning. The opinions of such mental health professionals are entitled to greater weight than the opinion of a non-acceptable mental health source such as a therapist.

(Doc. #6, *PageID* #53) (internal citations omitted).

In reaching this conclusion, ALJ applied the incorrect standard. According to the Social Security Administration, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' *including* the medical opinion of a treating source." Soc. Sec. R. 06-03p, 2006 WL 2329939, at *5 (Soc. Sec. Admin. Aug. 9, 2006) (emphasis added).[3] In other words, not only could the opinion of an "other source" equal the "probative value" of an opinion of an "acceptable source," it could be entitled to more. ALJ Motta, by applying the incorrect legal standard, gave significantly less consideration to Ms. Stephenson's opinion than the Regulations and rules require. This constitutes error. "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole,* 661 F.3d at 937 (quoting *Blakley,* 581 F.3d at 407.

There is also a question of the probative value of Dr. Dahar's signature on the assessment. The mental impairment questionnaire sent to Darke County Mental Health was signed by both Ms. Stephenson on March 17, 2014 and Dr. Dahar on May 28, 2014. (Doc. #6, *PageID* #s 1234-37). ALJ Motta treats the opinion as Ms. Stephenson's alone with mere concurrence by Dr. Dahar. Plaintiff contends this constitutes error, "as the opinion clearly represents that of Dr. Dahar, at least in so far as his signature represents an endorsement of the contents thereof." (Doc. #7, *PageID* #1598).

---

[3] Soc. Sec. R. 06-03p was rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, effective March 27, 2017. At the time of the ALJ's decision in this case, Soc. Sec. R. 06-03p was still in effect.

ALJ Motta's discussion of Dr. Dahar is limited to (1) noting he concurred with Ms. Stephenson's assessment; and (2) finding that "[e]ven if the extent of limitation described by Ms. Stephenson were to be attributed to her co-signer, Dr. Dahar, the opinion evidence is still not accorded significant weight because it is completely unsubstantiated by any other convincing evidence in the record." (Doc. #6, *PageID* #s 52-53).

The problem here is ALJ Motta did not discuss Dr. Dahar's treatment of Plaintiff or whether she considered him to be a treating or examining physician. Although "a physician's signature on an opinion from an 'other source' does not *per se* transfer that opinion from one of an other source to one by a medically acceptable treating source[,] … [It] does 'bolster' the view that the opinion of the other source is well-supported by the evidence of record and so entitled to greater weight." *Yerg v. Comm'r of Soc. Sec.,* No. 3:15CV499, 2016 WL 1161749, at *6 (N.D. Ohio Mar. 24, 2016) (Baughman, M.J.) (citing *Brock v. Colvin,* No. 2:10-cv-00075, 2013 WL 4501333, at *6 (M.D. Tenn. Aug. 22, 2013) (Nixon, D.J.). Thus, the weight of Dr. Dahar's signature cannot be determined without first classifying his status. It is the ALJ's duty in the first instance to determine whether Dr. Dahar is a treating source. *See Gibson v. Comm'r of Soc. Sec.,* No. 1:12-cv-535, 2013 WL 3155774, at *4-6 (S.D. Ohio June 20, 2013) (Litkovitz, M.J.). And, because ALJ Motta failed to "make specific findings regarding plaintiff's treatment relationship with Dr. [Dahar] pursuant to 20 C.F.R. § 416.902, including the nature and frequency of Dr. [Dahar's] examinations[,]" the Court cannot engage in a meaningful review of ALJ Motta's decision. *Id.* at *6; *see also Reynolds v. Comm'r of Soc. Sec.*, 424

F. App'x 411, 414 (6th Cir. 2011) ("An ALJ must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'") (quoting 5 U.S.C. § 557(c)(3)).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

## B. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041. The latter is

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenges to the ALJ's decision is unwarranted.

warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether she was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Amanda R. Werts was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

Date: August 7, 2017                          *s/Sharon L. Ovington*
                                              Sharon L. Ovington
                                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).